# United States District Court

<u>   Southern   </u> DISTRICT OF <u>   Texas   </u>

United States Courts
Southern District of Texas
FILED

JUL 1 1 2005

Michael N. Milby, Clerk of Court

UNITED STATES OF AMERICA
        V.
Stephen J. Feldheim
DOB: ▇▇▇▇▇▇

## CRIMINAL COMPLAINT

CASE NUMBER: V-05-36M

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about April 28, 2004 in Wharton County, in the <u>Southern</u> District of <u>Texas</u>

defendant did, knowingly conspire and agree with other persons to conduct and attempt to conduct a financial transactions affecting interstate commerce, then well knowing that the financial transaction involved the proceeds of some form of unlawful activity, that is, the distribution of controlled substances, which property involved in the financial transactions represented the proceeds of a specified unlawful activity, that is the distribution of controlled substances, with (1) the intent to promote the carrying on of specified unlawful activity; namely the distribution of controlled substances; and (2) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the said specified unlawful activity, in violation of Title 18, United States Code, Section 1956 (a)(1).

in violation of <u>Title 18</u> United States Code, Section(s) <u>1956(h)</u>
I further state that I am a <u>Special Agent, IRS Criminal Investigation</u> and that this complaint is based on the following facts:

See Attached

Continued on the attached and made a part hereof:        <u>X</u> Yes    No

_____
Signature of Complainant
Edward T. Dubberke, Special Agent

Sworn to before me and subscribed in my presence,

<u>   July   , 2003</u>                                 at   Corpus Christi, Texas
Date                                                     City and State

B. Janice Ellington United States Magistrate Judge     _____
Name & Title of Judicial Officer                       Signature of Judicial Officer

United States
    v.
Stephen J. Feldheim

## INVESTIGATION

**Traffic Stop and Consent to Search:**

On April 28, 2004, Texas Department of Public Safety Highway Patrol Trooper Scott D. Rosenberry was on routine patrol with his partner, Trooper Jason Henderson traveling southbound on United States (US) Highway 59 in Wharton County, Texas. At that time, Trooper Rosenberry observed a white Buick Rendevous sport utility vehicle (SUV) also traveling south on US Highway 59 to be following very closely to a vehicle traveling in front of the Buick in the same lane of traffic. In the opinion of the Troopers, there was less than one car-length of distance in between the Buick and the vehicle in front.

The Troopers then observed the Buick activate a left turn signal and abruptly change from the right lane into the left lane directly in front of the patrol car of the Troopers. As a result of this action, Trooper Rosenberry had to sharply apply his brakes to avoid collision with the Buick. The Buick was observed by the Troopers to then quickly changed lanes back into the right lane. The Troopers saw that the Buick did not leave sufficient clearance when it passed another vehicle to the right lane, and cut that vehicle off as the Buick moved back to the right lane. Troopers Rosenberry and Henderson continued to follow Buick and observed it to have an Illinois license plate number ███████ The Troopers also noticed that the Buick had a large citizens band (CB) radio antenna attached to the roof.

Trooper Rosenberry then ran a registration check on the Buick through Texas DPS communications in Pierce, Texas that revealed that the Buick was a rented vehicle that registered to the Alamo Financing Corporation. Trooper Rosenberry thought it to be peculiar for a rented vehicle to have a CB radio based on his experience as a Highway Patrol Trooper.

Trooper Rosenberry then drove his patrol car behind the Buick and activated his red and blue overhead emergency lights to conduct a traffic stop on the Buick for the erratic driving and improper lane usage. The Buick then moved onto the right improved shoulder of us 59 and came to a complete stop.

Upon exiting his patrol car, Trooper Rosenberry walked up to the Buick on the driver's side. As Trooper Rosenberry walked to the Buick, he looked inside and observed a dark colored suitcase in the rear hatch area. Trooper Rosenberry also observed a large laptop computer on the front passenger seat, and could

1

see it had a map program on the screen. Trooper Rosenberry also observed the CB radio.

Trooper Rosenberry greeted the driver and explained the reason for the traffic stop. As Trooper Rosenberry stood next to the driver's door, he observed a large fraternal order of police badge on the front dashboard of the Buick. The driver of the Buick then immediately displayed what appeared to be a New York City Police Department (NYPD) Chaplin's badge and a NYPD identification card.

Trooper Rosenberry found the driver to be a white male who wearing a tan colored vest and who appeared nervous as the Trooper spoke to him. Trooper Rosenberry then had the driver get out of the Buick and stand in front of the Trooper's patrol car. The driver was then identified as Stephen J. FELDHEIM after producing his New York driver's license ███████

Trooper Rosenberry asked FELDHEIM as to where he was going. FELDHEIM was observed to stammer and then stated to the effect, "I'm going to Brownsville." FELDHEIM then explained to the Trooper that he was a Chaplin who worked with race relations with the NYPD. FELDHEIM stated he had been driving for a long time from New York. FELDHEIM also said he had rented the Buick in New York. As FELDHEIM explained this, he appeared to Trooper Rosenberry to be very nervous frequently stuttering. During that time, both Troopers Rosenberry and Henderson observed FELDHEIM'S carotid artery was pulsing rapidly.

FELDHEIM then stated that was visiting a friend in Brownsville, "just for pleasure." FELDHEIM then said he would only be there for one day. Trooper Rosenberry thought it was unusual for a person to drive such a long distance to see a friend for such a short amount of time. FELDHEIM then stated he had stopped in Houston and North Carolina. Troopers Rosenberry and Henderson then walked back to the Buick and observed two cell phones on the front console and fast food wrappers in the vehicle.

Trooper Rosenberry then walked back and continued to talk with FELDHEIM, who then asked Trooper Rosenberry asked me if he had any patches he would like to trade. This is known by Trooper Rosenberry to be a common practice among police officers. But Trooper Rosenberry thought that FELDHEIM seemed very eager to get back into the Buick and was overly friendly in showing the Troopers that he was associated with law enforcement. In the experience of Trooper Rosenberry as a highway patrolman, he has stopped many personal vehicles that were driven by off-duty police officers. In many of those encounters, Trooper Rosenberry experienced that the officers seem generally like they are in a hurry and do wish to not have extended conversations about there work. FELDHEIM appeared to the Trooper behave in just the opposite manner and seemed very verbose in his answers to questions posed by the Trooper.

2

Trooper Rosenberry continued to talk with FELDHEIM, who stated he had not stopped to see any other friends on his trip. FELDHEIM said he would stop and see some friends on his way back to New York. Trooper Henderson asked FELDHEIM why he did not take more time for his trip. FELDHEIM gave an evasive answer and did not answer the question, by stating to the effect, "I'm only going for one day." As FELDHEIM responded, the Troopers noticed FELDHEIM appeared to take deep breaths. Trooper Rosenberry then asked FELDHEIM if he had been stopped at all on his trip, and again FELDHEIM did not answer the question. Instead FELDHEIM replied to the effect, "You know, I don't believe in radar detectors. I think they are disrespectful, I'm just enjoying myself - We don't have grass in New York City. I'm just soaking it all in."

Trooper Rosenberry noticed that throughout the roadside contact, FELDHEIM would provide rambling answers to questions asked by the Troopers, and that FELDHEIM appeared very nervous. FELDHEIM also continued to appear nervous, even after Trooper Rosenberry explained he (FELDHEIM) would receive a warning for his traffic violations. Trooper Rosenberry then asked FELDHEIM about the pay at NYPD. FELHEIM claimed the he and NYPD officers were paid very little. FELDHEIM then provided the Trooper with information as to the starting salary of a NYPD police officer, and then he talked about how much parking tickets cost in New York City.

Trooper Rosenberry then asked FELDHEIM how much money he brought with him for the trip. FELDHEIM said he had credit cards and $200.00 in U.S. currency. Troopers Rosenberry and Henderson observed that when talking about money, FELDHEIM swallowed hard before he answered. Trooper Henderson then asked FELDHEIM if he owned a car. FELDHEIM stated he had a car but did not want to bring it on the trip because of the distance involved. Trooper Rosenberry then asked FELDHEIM to see his rental agreement. FELDHEIM retrieved it from the Buick and Trooper Rosenberry reviewed the document and noticed that FELDHEIM had rented the Buick in New York City, but that he was to return the rental car on April 29, 2004 by 8:00 am at the Houston Hobby airport. This was in direct contradiction as to what FELDHEIM had told Trooper Rosenberry earlier in the interview, when FELDHEIM stated he was going to stop and see friends on his return to New York City. Trooper Rosenberry also found it strange that FELDHEIM would drive to from New York City to Brownsville and then take a plane flight home.

Trooper Rosenberry also realized that FELDHEIM would not have enough time to spend "one day" in Brownsville as he had said earlier. The Troopers had stopped FELDHEIM at approximately 10:54 PM on the 28th, and he was still at least 5 to 6 hours away from his destination. In addition, FELDHEIM said he would have to drive back to Houston to turn his car in on time. Trooper Rosenberry then asked FELDHEIM if they (the Troopers) were making him nervous. FELDHEIM replied to the effect, "I've been trying hard not to do things

3

wrong, I've been trying not to bother people." As he said this, the Troopers saw that FELDHEIM stammered his words and breathed deeply that the Trooper thought were indicators of possible criminal activity.

Based on the training and experience of Trooper Rosenberry in highway criminal interdiction, Trooper Rosenberry knew that FELDHEIM displayed numerous indicators of criminal activity. Trooper Rosenberry believed he had reasonable suspicion to believe FELDHEIM was engaged in some type of criminal activity based on the following reasons:

1. FELDHEIM was driving a rental car with a CB antenna. FELDHEIM also was overly friendly and appeared to try to deflect any investigation by displaying numerous law enforcement badges and identification cards. In his training and experience, Trooper Rosenberry knows this to be a method commonly used by criminals to confuse law enforcement and avoid detection.

2. FELDHEIM showed many verbal and nonverbal clues of deception, to include the following: He stuttered several times as he tried to answer the questions by the Troopers. He was so nervous during the contact that both Troopers Rosenberry and Henderson observed that his pulse seemed to be racing. This was evidenced by a pulsing carotid. He also gave very vague answers to questions posed. At times during the interview, he would not answer the questions, but instead provided answers that were totally irrelevant. Trooper Rosenberry knows through his training and experience, that people who are nervous because they are engaged in criminal activity can be overly talkative and give vague irrelevant answers to questions.

3. In the opinion of Trooper Rosenberry, FELDHEIM'S trip did not make logical sense. It would have been more cost effective and easier to fly from New York City to Brownsville if he was to spend only one day. FELDHEIM also was to turn in the rental car the next day at 8:00 am, but FELDHEIM said he was going to spend "one day" in Brownsville with his friend. FELDHEIM also stated that he was going to make several stops to see friends on his return trip to New York City and yet also stated he was to fly from Houston back to New York.

4. Trooper Rosenberry also observed that there were several fast food wrappers in the car which gave a "lived in" appearance to the car. Trooper Rosenberry knows this to be a possible indicator of criminal activity based on his experience.

4

Due to all these indicators, Trooper Rosenberry believed that FELDHEIM was engaged in some sort of criminal activity. Specifically, Trooper Rosenberry thought that FELDHEIM might be an illegal narcotics or currency courier.

At approximately 11:06 PM, Trooper Rosenberry asked FELDHEIM if he had and illegal contraband in the vehicle. Trooper Rosenberry specifically asked him if he had any drugs or large sums of currency in the vehicle. FELDHEIM denied any knowledge of any currency two times. In this respect, FELDHEIM answered, "No, No." As he answered the question, the Troopers noticed that FELDHEIM looked down and continuously folded his rental agreement. Trooper Rosenberry knows this to be a sign of a person who is nervous, and is trying to work off nervous energy.

Trooper Rosenberry then asked FELDHEIM for verbal consent for Trooper Rosenberry and Trooper Henderson to search the vehicle and its contents. FELDHEIM gave what appeared to the Troopers to be a reluctant consent. FELDHEIM hesitantly said, "Um, I really don't have a problem with you searching the contents in the car." Trooper Rosenberry then explained it was necessary for the search to be consensual, and FELDHEIM could say "no", and that the Troopers would not force him to consent.

Trooper Rosenberry then asked FELDHEIM if everything in the car belonged to him. FELDHEIM said to the effect, "Everything belongs to me in the car, I'm just dropping - uh, - I'm going to Brownsville to see a good friend." Trooper Rosenberry then asked FELDHEIM for the second time if he had any objections to the Troopers searching the Buick. FELDHEIM replied, "Honestly, I prefer not. I have these rights. I know those rights. You still have the right to do it, so I don't mind if you search the car."

As Trooper Rosenberry walked back to his patrol car to call for a DPS canine (K-9), Trooper Henderson ask FELDHEIM again if he was responsible for everything in the car and FELDHEIM replied, "I am personally responsible." This response was also overheard by Trooper Rosenberry. As Trooper Rosenberry called for the canine, FELDHEIM told Trooper Henderson that was taking "a package" to Brownsville for a man named "Bruno Goldberger". During further inquiry about the package by the Troopers, FELDHEIM said he was dropping off the box in Brownsville, but that he did not know what was in the box. FELDHEIM stated the box was from Mr. Goldberger and that it might be jewelry. FELDHEIM said he was just transporting it and he was not being paid.

Trooper Rosenberry asked FELDHEIM if he had a key to the box, and FELDHEIM became evasive and stated he might have some keys. Trooper Henderson then asked him again if he had a key to the box. FELDHEIM then stated he had a key to the box in his black bag on the back seat. Trooper Henderson found the key on a key chain in FELDHEIM'S black bag on the back seat of the Buick. The Troopers also observed a cardboard box on the seat that

5

had been taped. The tape had been cut, and the box appeared as if it had been opened. FELDHEIM told the Troopers the metal box was in the blue suitcase in the rear area of the Buick.

The Troopers then opened the suitcase and observed several Jewish religious items on top of the box. In his training and experience in highway criminal interdiction, Trooper Rosenberry thought that this might be a further indicator of criminal activity in that criminals often believe that religious items will bring good luck to the criminal endeavor, although FELDHEIM claimed to be a Rabbi. Trooper Henderson then opened the box. The metal box was found to contain a very large sum of United States currency. The currency was bundled in groups of $100 and $50 bills. The Troopers thought that the money in the box may be either the proceeds from, or to be used in commission of a felony.

Trooper Rosenberry then placed FELDHEIM under arrest and handcuffed him. Trooper Rosenberry checked the handcuffs for tightness and double-locked the handcuffs. FELDHEIM was placed in Trooper Rosenberry's patrol car in my patrol car and Trooper Rosenberry immediately read FELDHEIM his Miranda rights. FELDHEIM said that he understood his rights.

A further search of the blue suitcase revealed a white envelope that contained another two large bundles of $100.00 bills.

Trooper Rosenberry then transported FELDHEIM to the Texas DPS Office in Pierce (Texas). Trooper Henderson drove FELDHEIM'S Buick and the currency also to the Pierce DPS Office. At the Pierce DPS Office, FELDHEIM was placed in an office by himself and was not questioned by any uniformed officers.

While awaiting the follow-up investigators to arrive, the currency was counted by Troopers Rosenberry and Henderson. The combined total for the currency found was determined to be $298,850.00 (all United States currency).

**Follow-up Investigation:**

On April 29, 2004, at approximately 12:00 AM, IRS-CI Task Force Investigator (Texas DPS Sergeant) Jimmie Kaelin responded to the Pierce DPS Office concerning the seizure. Sergeant Kaelin arrived at approximately 1:00 AM the same day, met with the Troopers, and arranged to conduct an interview FELDHEIM at the Pierce DPS Office. Wharton County District Attorney Investigator Larry Hensley was also present to assist Sergeant Kaelin with the interview. At the onset of the interview, Sergeant Kaelin read FELDHEIM his constitutional rights and advised him that the interview was recorded. At approximately 2:00 PM on April 29, 2004, I met with Sergeant Kaelin and Investigator Hensley at the Pierce DPS Office and we again interviewed FELDHEIM with additional questions regarding the money.

6

During each of the interviews, FELDHEIM was voluntarily waived his rights to remain silent and agreed to talk with investigators about the seized currency after

being read his Miranda Rights. During the course of the interviews, FELDHEIM voluntarily, in summary, stated the following:

In the weeks prior to April 28, 2004, a man by the name of BRUNO GOLDBERGER (herein also referred to as GOLDBERGER) asked FELDHEIM to transport a package from New York City to Brownsville, Texas. FELDHEIM was unable to make the trip initially due to other obligations, and the trip was postponed until April 26, 2004. On Tuesday, April 26, 2004, GOLDBERGER again contacted FELDHEIM by way of cellular telephone and asked if FELDHEIM was available to deliver the package to Brownsville. FELDHEIM advised he was available. FELDHEIM claimed he did not inquire as to what was in the package at that time.

FELDHEIM, at that time, described to investigators a unique culture that exists in the business world of the Jewish community saying "Business deals are frequently done on a handshake and your word." With this in mind, FELDHEIM believed everything was on the level at that time. FELDHEIM said he had never before called into question GOLBERGER's character initially because he grew up with GOLDBERGER's son and believed GOLDBERGER to be a legitimate jewelry dealer, even though he had never been in or seen GOLDBERGER's place of business. FELDHEIM said that GOLDBERGER had close business ties and associates abroad primarily in Israel and Belgium, and often traveled to these countries.

Concerning the delivery of the package, GOLDBERGER instructed FELDHEIM to travel to a building located on West 48th Street in downtown Manhattan and meet with a man by the name of "LARRY" (last name unknown). FELDHEIM said he was to meet with LARRY in either suite #411 or #416 on the fourth floor. FELDHEIM was not able to remember the name of the building and was unsure of the exact suite number where he met LARRY. FELDHEIM brought with him a carrying case that he believed would be suitable for transporting the package.

FELDHEIM took the elevator to the fourth floor and knocked on the suite he was directed to, identified as either suite #411 or #416. A white male in his 60's, who identified himself as LARRY, greeted FELDHEIM. LARRY was casually dressed in khaki pants and a dress shirt. FELDHEIM was questioned as to why he was there. FELDHEIM said he was sent by GOLDBERGER to pick up a package. LARRY invited FELDHEIM in and began to interrogate him. Once satisfied, LARRY retrieved a cardboard box sealed with duct tape and handed it to FELDHEIM. LARRY gave FELDHEIM detailed and specific verbal instructions on where and to whom the package was to be delivered. FELDHEIM wrote some of this information down on a sheet of paper. LARRY told FELDHEIM to

7

take the package to a man by the name of "ISRAEL LISHKA" (herein also referred to as LISHKA) in Brownsville, Texas.

LARRY provided FELDHEIM with LISHKA's home telephone number (956) 542-3757, business telephone number (956) 546-4133, cellular telephone number (956) 454-3002, and a business address of 1304 East Adams Street. FELDHEIM was instructed to contact LISHKA using the information provided once he arrived in Brownsville and to complete the delivery. FELDHEIM wrote this information down on the same sheet of paper he had written the instructions given to him by LARRY. Before departing, LARRY volunteered the information to FELDHEIM that the box contained jewelry. FELDHEIM placed the cardboard box in the carrying case he brought with him and left the building.

FELDHEIM traveled to National Rent a Car in New York City and rented a Buick SUV (identified herein) with a personal credit card. FELDHEIM then withdrew Two Hundred Dollars ($200.00) of his own money from an ATM machine to finance the trip. FELDHEIM was told by GOLDBERGER that he (FELDHEIM) would be paid at least One Thousand Dollars ($1,000.00), plus expenses following the delivery of the package. FELDHEIM subsequently traveled in the rented Buick to his residence to pack for the trip to Brownsville. FELDHEIM said while at home he became curious about the contents of the box and decided to open it. FELDHEIM cut the tape securing the box and discovered a large sum of United States currency in bundles.

FELDHEIM said to his surprise, there was no jewelry in the box. FELDHEIM said he then counted the bundles of money and determined the amount to be approximately Three Hundred Thousand Dollars ($300,000.00). FELDHEIM took the money and placed it in a metal lockbox that he had in his residence. All but Twenty Thousand Dollars ($20,000.00) fit in the metal box. FELDHEIM placed the remaining money in an envelope and then placed both items in his luggage. FELDHEIM said he became very apprehensive and scared about delivering the box to Brownville knowing that he had been lied to about the contents. FELDHEIM said he then discussed the situation with his father who strongly discouraged FELDHEIM from traveling with the package. FELDHEIM said his father expressed concerns about the legitimacy of the trip and GOLDGERGER after learning the details about the money. FELDHEIM said that although he knew something was "wrong", he decided to make the trip anyway. In this respect, FELDHEIM stated that he knew that GOLDBERGER, and others, were probably using him (FELDHEIM) to facilitate some type of illegal activity involving the money. FELDHEIM further said he decided to make the trip because he needed the money and knew that he was going to be paid well by GOLDBERGER.

During the interview, FELDHEIM admitted to being nervous and lying to Troopers about having money in the vehicle. In this respect, FELDHEIM admitted he denied having any currency in the vehicle upon being asked by the Trooper.

8

FELDHEIM also said he "flashed" the Troopers a New York City Police badge hoping they would believe he was a police officer, and allow him to continue on his way without a search of the Buick.  FELDHEIM initially said the New York City Police Department (NYPD) had given him the badge as part of a community service program with the New York City Police Department.  Sergeant Kaelin later contacted the authorities at the NYPD and learned that FELDHIEM was never issued a badge by anyone at the NYPD.  FELDHEIM later admitted to Sergeant Kaelin that he had purchase the badge on his own without any approval or knowledge of the NYPD.

FELDHEIM said prior to departing New York City, GOLDBERGER had contacted him by way of FELDHEIM's cellular telephone and instructed him (FELDHEIM) not to "speed", or commit and traffic violations that may cause him to be stopped by the police.  At that time, GOLBERGER told FELDHEIM in the event he was stopped by the police with the package, just to call him (GOLDBERGER).  At that time, GOLDBERGER reassured FELDHEIM that he (FELDHEIM) would not be held responsible and nothing would happen to him (FELDHEIM), if he were stopped by police with the package.

As instructed following the seizure, FELDHEIM encouraged the investigators to contact GOLDBERGER and LISHKA at that time explaining that "they" would "clear-up the matter".  Sergeant Kaelin then allowed FELDHEIM to use FELDHEIM'S cellular telephone to call GOLDBEBER in New York City.  GOLDBERGER'S voice recorder picked each time, and FELDHEIM left messages to return the call.  GOLDBERGER did not return FELDHEIM'S calls.  At approximately 2:00 AM the same day, Sergeant Kaelin attempted to call GOLDBERGER using the telephone number (917) 705-5653 provided by GOLDBERGER to FELDHEIM.  Sergeant Kaelin left a message on a voice recorder for GOLDBERGER to return the call to Sergeant Kaelin.  GOLDBERGER did not return the call on that day.

Sergeant Kaelin then called LISHKA'S residence using home telephone number (956) 542-3757 provided by LARRY to FELDHEIM.  A woman answered the phone and Sergeant Kaelin identified himself and the reason for the call.  Sergeant Kaelin requested to speak to LISHKA.  The woman immediately became evasive when hearing of FELDHEIM'S arrest.  She said she didn't know him and didn't understand the situation.  She refused to put LISHKA on the phone.  After a while a man apparently took the phone from her and identified himself as LISHKA.  Sergeant Kaelin identified himself and reiterated the story of FELDHEIM'S arrest.   Sergeant Kaelin explained that FELDHEIM was stopped in Wharton County, Texas carrying a large sum of money in the vehicle and claimed to be en-route from New York City to Brownsville to drop off a box of jewelry with LISHKA.  Sergeant Kaelin advised that FELDHEIM had in his possession a document with LISHKA'S name, address and phone numbers.  LISHKA calmly said he did not know anyone by that name and wasn't expecting the delivery of any jewelry, or money.  Before the call ended, Sergeant Kaelin

9

provided LISKA with an office telephone number where Sergeant Kaelin could be reached in the event something jarred his memory.

The same day at approximately 10:00 AM, Sergeant Kaelin was alerted to several voice messages waiting on Sergeant Kaelin's state issue cellular telephone. The messages were from a man identifying himself as GOLDBERGER. Sergeant Kaelin returned the call at (917) 705-5653 and spoke with a man identifying himself as GOLDBERGER. Sergeant Kaelin advised him of FELDHEIM'S arrest in Texas and discovery of the money in FELDHEIM'S vehicle. Sergeant Kaelin also advised him that FELDHEIM claimed GOLDBERGER was the one who made all the arrangements for the delivery of the package in Brownsville.

During the course of the telephone conversation GOLDBERGER stated that he had indeed asked FELDHEIM to deliver a package to Brownsville, Texas. GOLDBERGER explained that the package given to FELDHEIM was to be delivered on behalf of a longtime acquaintance named, ADIK HOLLAND (herein referred to as HOLLAND). Accordingly, HOLLAND had asked for GOLDBERGER to provide a trustworthy individual to hand deliver some jewelry contained in the package to a man named ISRAEL LISKA in Brownville, Texas. GOLDBERGER advised HOLLAND that he could ensure pick-up and delivery of the package, and subsequently contacted FELDHEIM. GOLDBERGER said that HOLLAND is a foreign national living Belgium. According to GOLDBERGER, the contents of the package had been described by HOLLAND to be jewelry from a recently settled estate of a relative of LISHKA, who had recently passed away. GOLBERGER said he did not know LISHKA personally. GOLDBERGER again said that he was not aware of any money and that the package was to contain only jewelry. GOLDBERGER further said he could see no rationalization for anyone to transport large sums of money by highway. Before the phone call ended, Sergeant Kaelin provided GOLDBERGER with an office telephone number where Sergeant Kaelin could be reached.

**Drug Sniffing Canine Alert:**

At approximately 11:24 PM on April 28, 2004, Texas DPS canine handler Michael L Hubenak was notified to respond to the Texas DPS Piece office to conduct a canine search. Canine handler Hubenak met with investigators at the Pierce office and arranged for a canine search of the currency using a trained drug sniffing canine named "Tobie" that was conducted at approximately 3:38 AM, April 29, 2003. The search was conducted in the following manner. Tobie was allowed to sniff each of 6 cardboard test boxes in a line-up for the presence of narcotics traces, at which time, Tobie did not alert on any of the test boxes. The seized currency was then secreted in box number 4 unbeknown to canine handler Hubenak, nor canine Tobie. Canine Tobie was then again allowed to sniff each of the six (6) boxes, at which time Tobie gave a positive alert to box number 4 for the presence of narcotics traces, by aggressively scratching on box

number 4.

## CONCLUSION

Based on the foregoing information, I believe that there exists probable cause to believe that Stephen J. FELDHEIM knew that the seized currency represented the proceeds of some form of specified unlawful activity; and that he conducted, and attempted to conduct financial transactions designed to conceal and disguise the true illegal nature of the illegal currency, and to facilitate the carrying on of the specified unlawful activity, to wit: Conspiracy to Commit Money Laundering in violation of Title 18 USC 1956(h), Title 18 USC 1956 subsections (a)(1)(B)(i) and (a)(1)(A)(i).